IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISON

| | | |
|---|---|---|
| CYNTHIA JEAN LOTT | ) | |
| | ) | |
|      Plaintiff, | ) | |
| vs. | ) | Civil Action File No. |
| | ) | 4:22-CV-123-WTM-CLR |
| DEE DEE NOEL ESTES, individually, | ) | |
| | ) | |
|      Defendant. | ) | |

## **PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR SANCTIONS AND INCORPORATED MEMORANDUM OF LAW**

     Pursuant to Local Rule 7.5, Plaintiff and Counsel file their Response to Defendants Motion for Sanctions and Incorporated Memorandum of Law (Doc. 20) as follows.

## **BACKGROUND**

1.    <u>GENERAL FACTS</u>

     The majority of facts are not disputed.[1] As more fully presented in Plaintiff's Complaint (Doc. 1), on July 23, 2020, Plaintiff Cindy Lott left a friend's house and headed to get gas for her friend's pickup truck at the Pojo gas station and truck stop. As she arrived, Ms. Lott was pulled over by Deputy Aaron M. Cloyd of the Bulloch County Sheriff's Department Office ("BCSO") because, unbeknownst to her before the stop, her friend's pickup did not have a current tag. Deputy Cloyd and other deputies determined there was probable cause to search the truck and then Ms.

---

[1] Most of the facts regarding the incident giving rise to this suit recited in Defendant's motion are not relevant to the issue presented by this motion. They appear solely to embarrass Ms. Lott and paint her in a bad light before the court. However, in response and to correct various misstatements, Plaintiff felt some of these facts needed to be addressed. Moreover, the Defendant makes horribly speculative allegations of misconduct which are just that, horrible and speculative. As to the issue of credibility of the witnesses, that is an issue for trial or perhaps a dispositive motion, but not this motion.

Lott. Defendant was asked to come to the scene to search Ms. Lott because no female deputies were working (Exhibit 1, Cloyd Depo. 17:8-13; Exhibit 2, Oglesby Depo. 14:7-9).

On arrival, Defendant spoke to deputies and then to Ms. Lott, telling Ms. Lott that she was going to search her. At no time did officers believe Ms. Lott had a weapon or posed any safety threat to them or anyone else (Exhibit 1, Cloyd Depo. 17:14-24). She was at all times polite and cooperative, and Ms. Lott had no outstanding warrants or concern regarding other criminal conduct (Exhibit 1, Cloyd Depo. 17:25-19:10).

These facts are uncontested. The deputies testified they never asked or expected that Defendant perform anything more than a basic pat-down search (Exhibit 1, Cloyd Depo. 17:8-13; Exhibit 2, Oglesby Depo. 14:7-9). They didn't ask Defendant to reach inside Ms. Lott's clothing or conduct the "squat and cough" search which was improper outside a jail (Exhibit 1, Cloyd Dep 17:8-13; Exhibit 2, Oglesby Depo. 15:18-16:17). They never asked Defendant to perform a strip or body cavity search, as either would be improper (Exhibit 2, Oglesby Depo. 16:21-17:7). Defendant could have taken Ms. Lott to a safe and secure location to conduct an invasive search of her person, including strip or body cavity search but decided not to do so. No contraband or weapon was found during Defendant's search of Ms. Lott (Exhibit 1, Cloyd Depo. 23:4-11; Exhibit 2, Oglesby Depo. 14:16-15:4; Exhibit 3, Lanier 16:14-19; Exhibit 4, Estes Depo. 71:19-22). The deputies testified that they could not say for certain whether what Ms. Lott has alleged did or did not happen because they were talking and not paying attention[2] (Exhibit 1, Cloyd Depo. 22:16-

---

[2] Defendant attacks counsel by claiming he attacked the deputies at deposition. That is untrue. Counsel simply clarified that the deputies might not have seen everything because they were chatting during the search. (Exhibit 6, Bullman Dec. ¶28; Exhibit 3, Lanier depo. 14:5-11, 15:6-11; Exhibit 1, Cloyd depo. 22:16-24:7)

24:7; Exhibit 2, Oglesby Depo. 18:1-5). Two independent witnesses came forward and told Plaintiff and counsel that they saw Ms. Lott exposed (Doc. 1-1 ¶14; Exhibit 5, Williams Dec. ¶ 7). Ms. Lott has admitted she had a baggy with possible methamphetamine residue and a needle. Ms. Lott has never denied that she was arrested for possession of methamphetamine,[3] possession of drug related objects, and driving her friend's truck without a proper tag (Exhibit 7, Lott Depo. 40:19-41:6). However, she was not charged with possession of marijuana as Defendant asserts (Doc. 20, p1; Doc. 20-1, p2).

Defendant approached Ms. Lott and asked twice if Ms. Lott had anything "on or in her." Ms. Lott replied "no" each time. She then ordered Ms. Lott to face the dashcam and, "pick your bra up and shake it out" (Doc. 20-2, Cloyd Dash Cam 42:30-42:45). Ms. Lott is clearly nervous and trying to cooperate as she grabbed the top of her shirt and pulled her shirt and bra down. At no point did Defendant stop Ms. Lott[4] (Doc. 20-2, Cloyd Dash Cam 42:43-48). Continuing the search, in the middle of the public parking lot, Defendant told Ms. Lott to "spread them." Defendant kicked Ms. Lott's leg to move her legs further apart, and told Ms. Lott to "squat," "cough," "cough harder" (Doc. 20-2, Cloyd Dash Cam 42:49-56; Doc. 20-4, Cloyd Body Cam 40:15-26).[5] Defendant says she looks to the ground to see if anything has fallen out but doesn't touch Ms, Lott insider her clothes or pull her shorts down in any way (Doc. 20-7, Estes' Dec. ¶12

---

[3] The residue found was never tested because there was not enough to test.
[4] Contrary to Defendant's assertion that Ms. Lott has said Defendant ordered to pull her shirt down. Ms. Lott did not say this at deposition and any unintended misstatement in the Complaint was counsel's error. (Exhibit 6, Bullman Dec. ¶41)
[5] Defendant admits she conducts the improper "squat and cough" search every time she searches a female subject, despite having no lawful basis for doing so and was never taught or ordered to do so by her superiors, because she once failed to locate a knife that was concealed in a woman's private area.[5] (Exhibit 4, Estes Depo. 43:3-16)

¶13) This makes no logical sense, if she doesn't move Ms. Lott's shorts to allow something to fall out and/or reach inside her shorts in the area of her vagina and buttocks, to feel if anything came out of her body or both, as Ms. Lott has said, consistently. Further, contrary to Defendant's conclusory allegation that the videos show Defendant did not have the opportunity to pull Ms. Lott's shorts down at all, the video shows Defendant's hand move, as she bends down before ordering Ms. Lott to stand up. (Doc. 20-4, Cloyd Body Cam 40:20-26) Further, **Defendant's body-worn camera video shows Defendant's hand(s) go into Ms. Lott's shorts and into the area between Ms. Lott's legs**, as Ms. Lott has alleged. (Doc. 20-3, Estes Body Cam 1:28-33) And the dash cam video shows Ms. Lott's expression of surprise, pain and confusion which is the clearest, albeit unspoken, testimony available. (Doc. 20-2, Cloyd Dash Cam 43:00-09)

Defendant then concluded the search with a routine pat-down search (which is all the deputies expected, *see supra*) then checked Ms. Lott's hair and mouth. Despite finding nothing on or in Ms. Lott, Defendant warns Ms. Lott that if she had anything else on or in her to give it to the deputies. Ms. Lott, again, states clearly that she has nothing. Defendant then turned to the male deputies and states, "alright fellas, have fun" before leaving the scene. (Doc. 20-3, Estes Body Cam 2:51).

Ms. Lott's testimony supports her allegations that her bottom was exposed for a short period and that Defendant's fingers entered her body, inside her clothing (Exhibit 8, Lott Dec. ¶8) The deputies testified that they just do not know if it happened or not, and the video clearly shows Ms. Lott's reaction to what she has alleged, as it was taking place. *See* s*upra* p2. Video shows Defendant's hand enter Ms. Lott's shorts. (Doc. 20-3, Estes Body Cam 1:28-33) Only the Defendant has denied those allegations, in her self-serving testimony and declaration.

It is disturbing that Defendant suggests that exposing Ms. Lott's private areas and the offensive touching was somehow less traumatic because it only took a few seconds or was somehow justified by her misconduct (*i.e.*, having the baggy with residue, the needle and the traffic infraction). (Doc. 20 pp 1, 3).[6]  While Ms. Lott has admittedly had, and has, difficulty recounting the precise order of events, especially while being cross-examined by defense counsel who suggests that she was not being truthful. Confusion/memory issues regarding this traumatic event does not equate to dishonesty.[7] Further, asserting that she is lying because her recollection does not precisely mirror the allegations of the Complaint, which was drafted by her attorneys, in good faith, retraumatizes her as a victim.

Defendant repeatedly attacks Ms. Lott's and counsel's veracity, but does not mention Defendant's documented dishonesty. Both in her written discovery responses and at deposition, the Defendant denied a pattern of misconduct, internal affairs investigations, or citizen complaints. In fact, Defendant said the only times she had been subject to discipline were: (1) Tift County 911 for unprofessionalism; (2) verbal counseling for improper shift change at Brooklet Police Department (Exhibit 4, Estes Depo. 20:22-24:3; Estes Depo. 57:18-25); and, (3) terminated for unsatisfactory probation at Brooklet Police Department for "refusing to ride a call outside of the city limits" (Exhibit 4, Estes Dep. 57:18-25); and terminated by Savannah Chatham Police Department for failure to successfully complete probation. (Exhibit 4, Estes Depo. 53:8-13) but claims she could not remember why (Exhibit 4, Estes Depo. 12:21-14:16). While perhaps

---

[6]  There is no other logical reason to discuss Ms. Lott's criminal conduct, which she has admitted and addressed, in this motion regarding speaking to the media.

[7] https://www.justice.gc.ca/eng/rp-pr/jr/trauma/p4.html
  https://rachelmullinscounseling.com/2019/05/07/4-ways-that-trauma-affects-memory/

technically true, it was based upon dishonesty and interfering in the course of justice (Exhibit 9, Savannah Separation, p3).   And while she testified there were only two issues at Brooklet PD, there were, in fact, many more, such as insubordination, battery on her superior officer in violation of O.C.G.A. ¶16-5-23, failure to follow orders and the chain of command, conduct unbecoming a police officer, leaving BPD jurisdiction, being absent without leave, and numerous related BPD standard operating procedures. (Exhibit 10, BPD Documents) And these are just the problems at BPD. While Defendant testified that she had no other discipline or complaints whatsoever at other departments (Exhibit 4, Estes Depo. 20:20-26:10), that is not the case (Exhibit 12, Tift County Violations). Further, she testified under oath that her certifications had never been suspended or revoked (Exhibit 4, Estes Depo. 14:17-21). However, P.O.S.T. suspended Ms. Lott for 24 months on July 23, 2008 (Exhibit 11, P.O.S.T. Sanctions).[8] Defendant has made honesty and credibility an issue in this motion, yet the Defendant has a history of dishonesty, both as a police officer and during the course of this litigation.

2.   WSB INTERVIEW

On August 22, 2022, Ms. Lott and Mr. Bullman, gave an interview to an Atlanta news outlet, WSB. The story air date was November 10, 2022, which was decided by WSB, not Ms. Lott or Mr. Bullman. Since January 2021, when counsel and Isenberg & Hewitt began representing Ms. Lott, it was both counsels' and Ms. Lott's motivation to bring this conduct to light and to help other victims be willing to come forward and feel they too could have a voice and prevent future, unlawful, searches like these by law enforcement. This was the moving force behind Ms. Lott and

---

[8]  Defense counsel was given copies of Documents evidencing this pattern of misconduct in Plaintiff's Initial Disclosures on July 12, 2022, and responses to written discovery on August 2, 2022.

Mr. Bullman speaking with WSB, not to influence or prejudicially impact this litigation. (Exhibit 6, Bullman Dec.; Exhibit 8, Lott Decs generally).

On October 27, 2022, Lisa[9], a female who counsel and the firm are representing, spoke with the same reporter regarding her encounter with City of Griffin Police in which she was subjected to a similar, unlawful and humiliating search. Ms. Lott and Lisa, one hundred and seventy-six miles apart, experienced very similar encounters with female officers. Like Ms. Lott, Lisa hopes to bring awareness to this horrible pattern of illegal searches which seem to be happening all over Georgia (Exhibit 6, Bullman Dec. ¶¶18, 23-24, 33). WSB provided these women/victims a voice, and, in doing so, hopefully helped others in a way that brings about meaningful change. Due to the bravery of Ms. Lott and Lisa, seven people, men and women, have come forward with similar experiences though, to date, none in this District, likely because the story ran in the Atlanta area (Exhibit 6, Bullman Dec. ¶27). While the statute of limitations has run for some, these victims are willing to share their stories in hopes of preventing others from falling victim to sexual battery by officers. Also important is that due to the story by both Ms. Lott and Lisa, Georgia's P.O.S.T. council has apparently opened investigations into these and, apparently, other, similar incidents and contacted district attorneys to review the incidents (Doc. 20-10, p6). The City of Griffin has decided that, because of the WSB story, they, through the city

---

[9] In Defense's Motion, they state Lisa is another arrestee who counsel apparently represents. (Doc. 20 page 8 ¶ 2). Lisa was <u>not</u> arrested. This tactic of revictimizing and discrediting victims, based on self-serving assumptions and misstatements, is unkind and unprofessional, as is making sweeping and untrue claims of knowing counsel's or Ms. Lott's purpose for bringing to light this pattern of unconstitutional searches across Georgia.

attorney, have hired a private firm to investigate the police department.[10] This was Ms. Lott's and counsel's motivation, not to prejudice this action or interfere with a fair trial.

Ms. Lott's interview was two and a half months prior to her and Defendant's depositions. Ms. Lott relived the night of July 23, 2020, sharing what took place, explaining what she recalls, how it affected her, and why she came forward to share her story (Doc. 20-11 generally; Exhibit 8, Lott Dec. ¶18). In Ms. Lott's deposition on November 1, 2022, Mr. Massee played, replayed and replayed the body and dash camera footage, attacking and revictimizing Ms. Lott. Nevertheless, Ms. Lott recalled that her body was partially exposed, and Defendant put her fingers in Ms. Lott's private areas (Exhibit 7, Lott Depo. 133:6-134:5). While she may have been confused as to the exact order of events, she has never wavered on these facts: her body was exposed, and she was improperly touched by Ms. Estes (Exhibit 7, Lott Depo. 113:1-127:13; Exhibit 8, Lott Dec. ¶¶7-9). Plaintiff cannot say whether WSB attempted to contact Defendant or the City but Plaintiff has no information to contradict WSB's assertion that it did so, and Plaintiff certainly has not communicated with Defendant before or since this action was filed.

3.   <u>Social Media</u>

Along with airing the interviews of Ms. Lott and Lisa on November 10, 2022, WSB posted links on its Facebook[11] and YouTube channel. The posts/comments on social media platforms were not by Ms. Lott or counsel. Nor did Ms. Lott or counsel interact with any person to post or comment on their behalf. Neither Ms. Lott nor counsel posted the link on any social media site,

---

[10] https://the-grip.net/2022/12/14/boc-vote-and-contract-to-conduct-griffin-pd-operational-assessment-cloaked-in-secrecy/

[11] The November 10, 2020, Facebook post is no longer on the WSB's Facebook page. Plaintiff has not had any communication with WSB regarding why the post was taken down.

nor did the firm (Exhibit 8, Lott Dec. ¶20-21; Exhibit 6, Bullman Dec. ¶25-26). Defendant accurately points out that the news story spoke about two incidents, with two different officers, in two different jurisdictions (Doc. 20, p8). A review of the posts on WSB's pages does not reveal any threats against any party, nor do any suggest people have any involvement in this case (*e.g.*, protesting, coming to interfere with the processes of any court, etc.). Further, as is typical on social media platforms, opinions on both sides are expressed. Some clearly support law enforcement while others support the Defendant.

Angela William's post simply encourages victims and witnesses to speak up to stop improper searches. It does not encourage bad conduct or suggest any action (other than stepping up saying something), mention the lawsuit, or say anything about the Defendant (Doc. 20-15). Mr. Moore's statement that he was there relates to the search of Lisa, not Ms. Lott. He was there when Lisa was searched and appeared briefly on the WSB story (Doc. 20-14). And Christine Koehler's comment was simply suggesting something should be done to stop such searches. Nothing was said by that attorney who has no relationship to this matter about the case, witnesses, or what the outcome should be, and there is no way to even know if she were commenting on Lisa's case, which is not before this Court or the case that is (Doc. 20-13).

## ARGUMENT

I.  Applying First Amendment Principals the Court Cannot Find that the Rule was Violated

Despite the inaccurate and disparaging attacks by Defense counsel, Mr. Bullman has a history of serving crime victims, as a police officer, with victims' rights groups and as an attorney. He has been recognized by the Georgia legislature for his efforts in fighting for victims' rights and has worked hard to give a voice to victims by standing up for them across Georgia and in other

states, while providing *pro bono* assistance to good officers who have been falsely accused of misconduct. (Exhibit 6, Bullman Dec. ¶4-7) He did not intend to violate either the Rules of this Court, nor the standards of the profession (*Id.* generally and ¶¶20,29,43). There is no evidence of bad faith, other than the unsupported and false aspersions by Defendant. Counsel had no scheme other than to continue the fair and ethical representation of crime victims, like Ms. Lott and Lisa, and to bring about positive change for victims and positive reform in law enforcement (*Id.* generally and ¶¶7-12, 20, 24, 29). Neither counsel nor the firm posted the story or any comments about it on any platform and he isn't a marketing guru, as was the case of the plaintiff in Mai v. Nine Line Apparel, Inc. 2019 WL 5092478 (cited by Defendant[12] (*Id.* ¶34-35).  And, there was no attempt to punish the Defendant for failing to settle the case at mediation or otherwise. (Exhibit 6, Bullman Dec. ¶31-32).

Defendant alleges Plaintiff made baseless allegations in the story. (Doc. 18, p17-18). That is not true. Ms. Lott recounted the same allegations which she has always made, that private parts of her body were exposed and she felt Defendant's finger(s) insider her body and between the cheeks of her bottom. In support of Defendant's baseless allegation, Defendant states that the deputies did not see this happen and counsel attacked them for saying so (Doc. 20 pp16-18). As discussed *infra* and in counsel's declaration, the deputies were not attacked, but their depositions were taken to confirm that they could not tell if Ms. Lott was exposed or if she was penetrated by Ms. Lott's fingers. (Exhibit 6, Bullman Dec. ¶28). While Defendant denies these facts, Ms. Lott unwaveringly says they happened. The allegations are not baseless. Further, Defendant admits that

---

[12] Nine Line is the case we can find in which an almost identical motion was filed in this same court, by the same law firm (as Doc. 17 of that case), and the facts are clearly distinguishable.

she performs the "squat and cough" style search on Ms. Lott, as she does with every female she searches in the field (*see supra* p3 and FN5), and if Defendant did not expose Ms. Lott's body and/or put her hands inside her clothing to check to see if Ms. Lott had any contraband, conducting the squat and cough portion of the search, which should not be done outside a detention facility, would serve absolutely no purpose.

The Plaintiff does not disagree with Defendant's recitation of the law regarding the court's inherent authority to manage its affairs, to achieve the orderly and expeditious disposition of cases before it, and the ability of courts to punish for contempt or other, appropriate sanctions to that end (Doc. 20, p14-15 citations omitted). Further, Plaintiff acknowledges "[a] court may exercise this power to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Purchasing Power, LLC v. Bluestem Brands, Inc. 851F.3d 1218, 1223 (11th Cir. 2017). The Defendant properly quotes the court's Local Rule 11.2 (Doc. 20, p15 citations omitted) which states:

> It is the duty of every lawyer or law firm associated with the case not to release or authorize the release of information or an opinion, which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent civil litigation with which he or his firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

S.D. Ga. L.R. 11.2.

While the Plaintiff admits that the court has the power to sanction willful disobedience of a court order and to sanction a party (including the Plaintiff) who has acted in bad faith, Purchasing Power, at 1223, LR 11.2 does not apply to parties, but to attorneys and law firms, and there has been no gag order or other limitation of communications addressed to the parties by the court in

this case. The Defendant has never spoken to counsel about or requested from the court, a gag order in this case.

The court's local rule states that attorneys and law firms are not to disseminate through public communications information about a case in this district, <u>if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice</u>. S.D. Ga. L.R. 11.2. This court determined that, to permit sanction for violating this rule or an order of the court, there must be a finding of bad faith. <u>Nine Line</u>, at *1-3 (citing <u>Purchasing Power</u> *supra*). Further, this court held that the "power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." <u>Thomas v. Tenneco Packaging Co.</u>, 293 F.3d 1306, 1320 (11th Cir. 2002)(further cites omitted). <u>Nine Line</u> at 2-3 "This power 'must be exercised with restraint and discretion' and used 'to fashion an appropriate sanction for conduct which abuses the judicial process.' <u>Purchasing Power, LLC v. Bluestem Brands, Inc</u>., 851 F.3d 1218, 1223 (11th Cir. 2017)" (further citations omitted).

> "The key element to unlocking the court's inherent ability to sanction is a finding of bad faith. *Id.* "The inherent-powers standard is a subjective bad-faith standard." *Id.* Examples of conduct rising to the level of bad faith include knowingly or recklessly making a frivolous argument, arguing a meritorious claim simply to harass an opponent, delaying or disrupting the litigation, and hampering the enforcement of a court order. Thomas, 293 F.3d at 1320 (further citations omitted).

<u>Nine Line</u>, at *2-3. Plaintiff and counsel submit there was no bad faith on part of either and neither believed there was any likelihood their actions would interfere with a fair trial or the administration of the case (Exhibit 6, Bullman Dec.; Exhibit 8, Lott Dec. generally).

As discussed more *supra*, the following facts are evidence of Plaintiff's actual motives and do not support a finding that counsel acted in bad faith or in a manner designed to prejudice the administration of justice: the news outlet contacted is in Atlanta, not South Georgia, and no media

organization in this district was contacted; the media was initially contacted even before it was decided to file suit; the court where this action is pending is never mentioned; there is no call to take any action (regarding the case or anyone involved) other than to step forward and hopefully bring about change; and, speaking with the media was done months, if not years, in advance of any hearing or trial of this case. These facts, combined with the stated objectives of both Ms. Lott and counsel, do not evidence bad faith or the intent to willfully disobey any court order.

Defendant argues that Plaintiff and counsel intended to sway public opinion, to taint a jury pool, and interfere with the administration of a fair trial and that the conduct rises to a level of bad faith and oppressiveness (Doc. 20, p18).   This is a speculative, nonsensical, and unfair mischaracterization of the Plaintiff's and counsel's motives. Counsel contacted WSB with Plaintiff's consent, after speaking to Ms. Lott about the apparent pattern of improper searches in Georgia to stop and to try to help others (Exhibit 6, Bullman Dec. ¶¶20, 24; Exhibit 8, Lott Dec. ¶¶17-18, 22, 29). Fortunately, some action has begun to protect people from these improper searches, and other victims have courage to come forward, as a result of speaking to the media (Bullman Dec. ¶26-27). This demonstrates Plaintiff's and counsel's motives (as well as Lisa's) were well-founded and will hopefully bring about change, and there is evidence that some change is already taking place. *See supra* p7 and FN 10.

Plaintiff disputes Defendant's misrepresentations, unsupported conclusions, and speculation. In the absence of some sort of oral or written statement to the contrary, the Defendant would never be permitted to testify in a trial about what others believe or their intent – and this applies to counsel and Ms. Lott.  Certainly, neither counsel, nor Ms. Lott, ever said to Defendant or anyone else that it was their intent to violate the rules of this court or improperly interfere with

the administration of justice. This is rank and baseless speculation and neither had any desire to improperly influence this case or to prejudice the course of justice (Exhibit 6, Bullman Dec.; Exhibit 8, Lott Dec., generally).  In contacting the media, it was neither counsel's nor Ms. Lott's intent to influence the parties (whether it was regarding hoping for a settlement or otherwise) or in any way prejudice the due administration of justice or violate the court's order (Exhibit 6, Bullman Dec. ¶20; Exhibit 7, Lott Dec. ¶¶15-16, 18, 22, 27). Nor did counsel believe that there was any likelihood doing so would influence the outcome of this case (Exhibit 6, Bullman Dec. ¶20).

The intent of the interviews was simple.  Both Mr. Bullman and Ms. Lott want to encourage others who have been subjected to similar improper searches are to come forward to discourage them from happening (Lott Dec. ¶29; Bullman Dec. ¶¶24, 27, 29). These motives are not evidence of bad faith or a willful violation of any order. Rather, the stated objective appears to be having the desired effect.

The Nine Line case is distinguishable and the facts are dramatically different.  In Nine Line, the plaintiff, a self-proclaimed marketing and PR guru, explained her understanding of how the information she was posting could create bias, and began the internet, media campaign after a failed mediation, in an effort to apply public pressure on the Defendant to settle the case. Nine Line, at *3-4. Also, the "[p]laintiff "was aware that the Defendant objected to such publication and was seeking to prevent [p]laintiff from making public comments" by a previous motion. Id, at *4. Even with far more evidence of directed and purposeful conduct by the Nine Line plaintiff which the court found was done in bad faith, the court did not dismiss that plaintiff's claim. As explained supra, neither Plaintiff nor counsel are marketing or PR experts, made no internet postings or comments themselves on any platform (Bullman Dec. ¶34). There has not been, and likely will

never be, a mediation or settlement offer made by Defendant in this case (*Id.* ¶32). No gag order was entered or requested as in <u>Nine Line,</u> and Defendant never mentioned the desire to keep the facts of this case out of the public eye (*Id.* ¶43).

In <u>Martin v. Prospect Airport Services, Inc. *et al.*</u>, 2022 WL 4596637 (N.D. Ga. August 2022), the district court denied defendant's motion for sanctions and to enjoin extrajudicial conduct. As in <u>Nine Line</u> the court recognized the power to proscribe certain extrajudicial remarks, <u>Martin</u> at *2. The court discussed the <u>Nine Line</u> case as it applied to the defendant's motion for sanctions. Discussing the plaintiff's conduct in <u>Nine Line,</u> the court pointed to the extreme nature of the plaintiff's conduct there. *Id.* at *2-3. The <u>Martin</u> defendant argued that the plaintiff's conduct was more egregious than that of the plaintiff in <u>Nine Line</u>. *Id. a*t *3.

> United contends Plaintiff's conduct is "far more egregious" than the conduct in Mai. (Dkt. 40-1 at 14.) United requests the Court sanction Plaintiff for his extrajudicial conduct "which is inappropriate, escalating, and taken only to vex the defendants and to pressure United and Prospect into paying." (Id. at 13–14.) United contends there is no legitimate reason for Plaintiff's conduct other than to harm United's business, influence the public and potential jury's perception, harass officers and employees, and unduly influence settlement negotiations. (Id. at 15.)

*Id.* The court disagreed and denied the motion. *Id.* The court explained that:

> The Court finds *Cardinale v. City of Atlanta*, No. 1:20-CV-01077, 2020 WL 3046396 (N.D. Ga. June 8, 2020) and Rossbach *v. Rundle*, 128 F. Supp. 2d 1348 (S.D. Fla. 2000) instructive. The *Cardinale* court denied the defendant's motion to cease extrajudicial communications because the defendant in that case identified no purported prejudice other than annoyance and the fact that communications distract officials. 2020 WL 3046396, at *7. **The court specifically noted the defendant had not alleged that the plaintiff was criminally harassing or threatening employees or city council members outside of their work roles or had engaged in or was likely to engage in witness tampering or intimidation or other truly harassing behavior, which would rise to the level of prejudicial conduct**. Id. The *Rossbach* court also denied a motion to restrict counsel and parties from making extrajudicial statements to the media because that **"type of extreme remedy is reserved for only the most notorious of cases, where the potential**

**for pretrial publicity impacting upon the right to a fair trial is great."** 128 F. Supp. 2d at 1355.

*Id.* at 3 (emphasis added). The <u>Martin</u> court found the same and went on to hold that, "Even if Plaintiff's conduct harms [defendant's] business or influences settlement negotiations, such conduct does not rise to the level of prejudicial conduct." *Id.* And while defendant contended the plaintiff's actions our taint a jury pool, a gag order was not the least restrictive means of preventing prejudice. *Id.*

> Rather, searching questions of potential jury members about whether they have viewed Plaintiff's social media or were at the airport during one of Plaintiff's protests combined with an instruction that empaneled jury members are not to view Plaintiff's social media or any relevant articles during the trial will address United's concern with far less imposition on First Amendment freedoms. "While it might be unrealistic to think that voir-dire questions and instructions to the jury can adequately counter the 'increasingly widespread media coverage of criminal trials,' that is not at issue here." *United States v. Carmichael*, 326 F. Supp. 2d 1267, 1295 (M.D. Ala. 2004) (quoting *Brown*, 218 F.3d at 431). As to the harassment of employees, annoyance at work is not enough for a gag order. See *Cardinale*, 2020 WL 3046396, at *7 ("Importantly, the City has not alleged that Plaintiff is criminally harassing or threatening employees or city council members outside of their work roles or has engaged in or is likely to engage in witness tampering or intimidation or simply other truly harassing behavior, which would rise to the level of prejudicial conduct."). And as to the alleged "threats," the Court is not obtuse to the fact that disgruntled people may take drastic action. But the Court does not find the picture of slaves *Plaintiff* posted on Facebook forewarns any such action.

*Id.* at 3 (emphasis added). The <u>Martin</u> case, decided a few months ago, is instructive and provides an analysis of the relevant factors. Here, there is no criminal harassment or threats by Ms. Lott or anyone else. Any posts which are unpleasant are hyperbole and/or did not directly encourage harm to anyone, on either side – and regardless cannot be attributed to Plaintiff or her counsel.

The Georgia Supreme Court case of <u>WXIA-TV et al. v. Georgia</u>, 303 Ga 428 (2018) likewise addresses gag orders and prior restraint, such as L.R. 11.2, in very similar context of restraining attorneys and media. This appeal to the Georgia Supreme Court pertains to a gag order

which restrained lawyers in a murder case. The order proscribed certain extrajudicial, public statements communications by the defendant and the lawyers (in this and a related case), court personnel, and current and retired law enforcement regarding a murder case for so long as it remains pending. WXIA-TV at 428. The court held that a gag order might be constitutional in "exceptional circumstances," but the circumstances were not sufficiently exceptional to warrant such a restraint, and the gag order was vacated." *Id.* The record revealed the majority of the media coverage was in the court where the case was pending, and to a lesser degree, in the Atlanta market, and even by a few national news organizations. *Id.* Here, the actual news coverage was limited to a single Atlanta news outlet. The superior court explained its gag order was necessary due to being a high-profile case and, "there is a reasonable likelihood that [defendant]'s sixth amendment right to a fair trial, by an impartial jury may be prejudiced by extra judicial statements." *Id.* at 429. In an effort similar to that of Defendant in this case, the defendant tendered 78 exhibits which consisted of online search results, articles, and commentary to illustrate the extent of media coverage and interest in the case, arguing the gag order was warranted because of the significant media attention and nature of remarks. *Id.* at 430. Even when the trial court modified the gag order, to make it much narrower, the Georgia Supreme Court found that, even in a high-profile murder trial of a criminal defendant, the gag order was an improper restraint under the First Amendment and was vacated.[13] Despite the airing of the story and the brief flurry of activity and social media

---

[13] WXIA involved restraint of individuals, counsel, and the media. The court held that, even under the most deferential standard which might support a limited gag order (as in Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991) and contrary to Nebraska Press Assn. v. Stuart, 427 U.S. 539 (1976)), in this criminal case, resulting in issues involving both 1st and 6th Amendment protections, the court still held the gag order was an unconstitutional restraint. WXIA at 433-434; 441.

reaction, the case at bar is not a high profile case that has or likely would garner national attention and the 6th Amendment is not implicated.

In <u>Nebraska Press</u>, *supra*, the Supreme Court had to determine whether, as Learned Hand put it, "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." … To do so, we must examine the evidence before the trial judge when the order was entered to determine (a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger. The precise terms of the restraining order are also important. We must then consider whether the record supports the entry of a prior restraint on publication, one of the most extraordinary remedies known to our jurisprudence." <u>Nebraska Press</u> at 562.

> The obvious alternatives to gag orders are: (a) change of trial venue to a place less exposed to the intense publicity that seemed imminent in Lincoln County; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors, as Mr. Chief Justice Marshall used in the Burr Case, to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court. Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements of the jurors' oaths.

*Id.* at 563-564. While <u>Nevada Press</u> deals solely with prior restraint and not discipline imposed for violation of a general state bar rule limiting speech a hybrid of which is at issue under L.R. 11.2, the discussion regarding the constitutional principles apply to the whole of this motion and particularly the evaluation of Ms. Lott's conduct. She had no intention, whatsoever, to wrongly influence these proceedings, Further, the court made clear, "a fundamental difference between a gag order challenged by the individual gagged and one challenged by a third party; an order

objected to by the former is properly [treated] as a prior restraint, one opposed solely by the latter is not." *Id.* at 438 (citing <u>State of Montana v. Montana 21st Judicial Dist. Court</u>, 281 Mont. 285, 933 P.2d 829, 839 (1997)). Therefore, the standard for restraining persons who are gagged is higher than third parties. *Id.*

In <u>Gentile v. State Bar of Nevada</u>, 501 U.S. 1030 (1991) the Supreme Court addressed a state bar rule limiting speech by counsel by the Nevada Supreme Court (similar in nature to L.R. 11.2), in a plurality decision, the Supreme Court held that the lower standard of, "substantial likelihood of material prejudice" was appropriate when dealing with a general rule regarding attorneys' public remarks in pending cases. Gentile, supra.

L. R. 11.2 has an even lower standard of "a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." S.D. Ga. L.R. 11.2. The Plaintiff and counsel did not believe there was a reasonable likelihood of prejudice as explained above and in their declarations submitted with this response, much less a substantial likelihood it would do so.

While the Nevada rule was held void for vagueness, Justice Kennedy explained the importance of an attorney's free speech rights.

> At the very least, our cases recognize that disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and that First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law. See, e.g., *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *Bates v. State Bar of Arizona*, supra. We have not in recent years accepted our colleagues' apparent theory that the practice of law brings with it comprehensive restrictions, or that we will defer to professional bodies when those restrictions impinge upon First Amendment freedoms. And none of the justifications put forward by respondent suffice to sanction abandonment of our normal First Amendment principles in the case of speech by an attorney regarding pending cases.

<u>Gentile</u> at 1054. Further,

> Only the occasional case presents a danger of prejudice from pretrial publicity. Empirical research suggests that in the few instances when jurors have been exposed to extensive and prejudicial publicity, they are able to disregard it *1055 and base their verdict upon the evidence presented in court. See generally Simon, Does the Court's Decision in *Nebraska Press Association* Fit the Research Evidence on the Impact on Jurors of News Coverage?, 29 Stan.L.Rev. 515 (1977); Drechsel, An Alternative View of Media–Judiciary Relations: What the Non–Legal Evidence Suggests About the Fair Trial–Free Press Issue, 18 Hofstra L.Rev. 1 (1989). *Voir dire* can play an important role in reminding jurors to set aside out-of-court information and to decide the case upon the evidence presented at trial. All of these factors weigh in favor of affording an attorney's speech about ongoing proceedings our traditional First Amendment protections.

<u>Gentile</u> at 1054-1055. The attorney in <u>Gentile</u> had given a press conference after his client would be indicted and making direct and biting accusations of corruption and misconduct by "crooked cops" and prosecutors in the vein of the French connection in New York. *Id.* at 1059 (Appx to opinion). Additionally, unlike L.R. 11.2, the Nevada rule provided examples of impermissible communications as a guide to attorneys. Nevertheless, it was held void as vague. Without a hearing on the necessity of limiting extra judicial remarks in this case (or even the application for one, as this same firm did in <u>Nine Line</u>) the Defense suggests L.R. 11.2 entirely prescribes communications about a pending case, entirely vitiating Counsel's and Ms. Lott's First Amendment rights.

> "[I]n some circumstances press comment is necessary to protect the rights of the client and prevent abuse of the courts. It cannot be said that petitioner's conduct demonstrated any real or specific threat to the legal process, and his statements have the full protection of the First Amendment.

<u>Gentile</u> at 1058. Justice Kennedy's words apply here as well.

Even in cases in which a general prohibition of extra-judicial comments has been held, generally acceptable under at least a "substantial likelihood" standard none went so far as to apply

this same, lower standard, or even a higher standard, to "imminent civil litigation" as does L.R. 11.2. Respectfully, preventing attorneys from speaking about even possible litigation which might be before the court in the future certainly exceeds any reasonable limitation of the First Amendment.

The sanction Defendant seeks in the dismissal of Plaintiff's case is not appropriate. Even in Nine Line this court did not dismiss the plaintiff's case, despite extent of the plaintiff's conduct in, according to the court, attempting to wrongly impact her case. Nine Line, at *5. There is no evidence that Ms. Lott acted with any such malice or evil motives as the court found in Nine Line. Levying such an extreme sanction is a heavy punishment appropriate only as a last resort, when less drastic sanctions would not ensure compliance with court's orders" Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc, 561 F.3d 1298, 1306 (11th Cir. 2009). The Eleventh Circuit also held that the inherent power to sanction, "must be exercised with restraint and discretion." Eagle, at 1306 (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980)). "The key to unlocking a court's inherent power is a finding of bad faith." Id. (citing Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir.1998).  Ms Lott has not acted in bad faith.

II.  The Rule is Void for Vagueness

"The void-for-vagueness doctrine is concerned with a defendant's right to fair notice and adequate warning that his conduct runs afoul of the law." Gentile at 1077-78 (citations omitted). "The general test of vagueness applies with particular force in review of laws dealing with speech." Hynes v. Mayor & Council of Borough of Oradell, 425 U.S. 610, 620 (1976).  Where individuals of "common intelligence" are required to guess at the meaning of a law, or in this case a rule, it

fails for vagueness.  Id.  At best, and without conceding as much, common intelligence may[14] suggest that it would be improper to give an interview to WSAV on a matter of local public concern.

But, applying LR 11.2 past a local or perhaps a national interview in a case involving a matter of national interest is problematic because it does not provide adequate notice as to when or where a party or an attorney can speak or frankly about what. Ms. Lott's interview was exceptionally limited.  She did not speak about anything other than describing what had happened to her.  Had the same interview been done before the lawsuit was filed the Court would have no jurisdiction to sanction anyone and the issue would be resolved during voir dire. Mr. Bullman didn't say anything about this case at all.  The prohibition is on dissemination about a case by means of public communication.  Can an attorney speak about a pending case to a bar conference? What if that conference was covered by the media?  Could Mr. Bullman give an interview to a newspaper in Montana or a television station in Nebraska?  Exactly where is the line that would permit counsel or a litigant to reasonably believe that anyone in one of the four counties that this division draws juror from would be likely to have seen a four-minute story on an Atlanta news station.[15]  If the interpretation of the rule is that there is no limit then the rule must fail because it presumes that any public dissemination would be received and prejudicial. Beyond that, this Court cannot possibly draw any inference that either Ms. Lott or Mr. Bullman ever had access to any

---

[14] As a result of polarization and streaming, it is doubtful that a substantial enough percentage of a future venire would see and be prejudiced by an interview in local news assuming anything prejudicial was said.  The burden to prove prejudice is on the Defendant and it is not practically possible for that burden to met.

[15] https://www.wsbtv.com/video/local-video/georgia-police-strip-searched-women-exposing-private-parts-front-strangers/d93a61c1-1e61-4577-b8e5-fa06cd3bc7d7/

social media analytics that would suggest knowledge that anyone from Bryan, Chatham, Effingham, or Liberty County would have seen the story.

However, to the extent that the rule itself applies to social media, it begs the question, in the absence of targeted and paid promotion of a social media post, how would counsel or client have any idea who in the four-county area would see any such social media.  If a single tweet goes "viral" this rule may apply, but if no one sees it but the party's mother then it doesn't?  Such a rule fails any test for vagueness.

## CONCLUSION

For the reasons set forth above, Defendant's motion for sanctions should be denied.

This 23<u>rd</u> day of <u>December</u> 2022.

ISENBERG & HEWITT, P.C.

*/s/Ryan L. Isenberg*
Ryan L. Isenberg
Georgia Bar No. 384899
Mark B. Bullman
Georgia Bar No. 094376
Attorney for Plaintiff

600 Embassy Row, Suite 150
Atlanta GA 30328
(770) 351-4400
ryan@isenberg-hewitt.com

23

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that I have this day served all parties in this case in accordance with the

directives from the Federal Rules of Civil Procedure, Local Rules, and agreement of counsel Rules,

by e-mail to the following:

Patrick T. O'Connor, Jacob D. Massee, Amelia C. Stevens
Oliver Maner LLP
Post Office Box 10186, Savannah, Georgia 31412
astevens@olivermaner.com
pto@olivermaner.com
jmassee@olivermaner.com

This <u>23rd</u> day of <u>December</u> 2022.

ISENBERG & HEWITT, P.C.

*/s/Ryan L. Isenberg*
Ryan L. Isenberg
Attorney for Plaintiff

600 Embassy Row, Suite 150
Atlanta GA 30328
(770) 351-4400
ryan@isenberg-hewitt.com