### IN THE UNITED STATES DISTRICT COURT FOR
### THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

CYNTHIA JEAN LOTT,          )
                               )
      Plaintiff,          )
                               )
v.                         )     CASE NO. CV422-123
                               )
DEE DEE NOEL ESTES,       )
Individually,            )
                               )
      Defendant.          )
                               )

## O R D E R

Before the Court is Defendant Dee Dee Estes's Motion for Sanctions (Doc. 20), which Plaintiff Cynthia Lott has opposed (Doc. 29). On February 7, 2023, the Court conducted a hearing on the motion and heard the arguments of counsel for both sides. (Doc. 46, Attach. 1.) After taking the matter under advisement, Defendant's motion (Doc. 20) is **GRANTED IN PART** and **DENIED IN PART**.

### BACKGROUND

I.   <u>PLAINTIFF'S COMPLAINT</u>

On May 10, 2022, Plaintiff filed her complaint asserting claims pursuant to 42 U.S.C. § 1983 and Georgia law and alleging that Defendant conducted an unreasonable search and seizure by performing a strip and body cavity search in public view. (Doc. 1.) As alleged by Plaintiff, a Bulloch County Sheriff's Office deputy pulled Plaintiff over in the parking lot of a gas station on July 23, 2020, for driving a vehicle without a current tag.

(Id. at ¶¶ 8-9.) During the stop, deputies determined there was probable cause to search the vehicle, which revealed drug-related paraphernalia. (Id. at ¶¶ 10-11.) The deputies decided Plaintiff should be searched, but no female deputy was working. (Id. at ¶¶ 13-14.) As a result, Defendant, a female police officer with the Brooklet Police Department, was dispatched to the scene. (Id. at ¶ 15.)

Defendant instructed the male deputies to step back and ordered Plaintiff to stand in front of a deputy's patrol car. (Id. at ¶¶ 24-25.) As alleged by Plaintiff, Defendant "had [Plaintiff] pull down her shirt and bra, thereby exposing her bare chest and breasts fully in public." (Id. at ¶ 27.) Next, Defendant "ordered [Plaintiff] to bend down and cough and then cough again, harder." (Id. at ¶ 28.) Defendant "then stuck her hands into [Plaintiff's] shorts and felt inside her shorts and into private areas of [Plaintiff's] body inside her shorts[,]" and "[i]n doing so, Defendant [] made contact with [Plaintiff's] buttocks and her vagina with her fingers." (Id. at ¶¶ 29-30.) After this, Defendant ordered Plaintiff to "bend over the hood of the police car[,]" pulled down Plaintiff's shorts to expose her buttocks and genitals, and "reached inside [Plaintiff's] opened shorts ([Plaintiff] did not have any underwear on), touching her skin inside her pants in the front and the rear of her shorts." (Id. at ¶¶ 31-33.) Defendant then spread apart Plaintiff's buttocks, placed her fingers there,

2

and penetrated Plaintiff's vagina with her fingers. (Id. at ¶¶ 34-35.)

On June 7, 2022, Defendant answered Plaintiff's ·complaint. (Doc. 6.) Defendant "denied all allegations that she conducted a strip search or a body cavity search or acted otherwise inappropriately." (Doc. 20 at 4.)

II.  <u>MEDIA COVERAGE</u>

Mr. Mark Bullman, one of Plaintiff's attorneys, and his law firm reached out to WSB-TV Channel 2 Action News ("WSB-TV"), a major television station in Atlanta, Georgia, regarding Plaintiff's story in "early to mid-2021" after "the City of Brooklet denied liability and said it didn't do any internal affairs investigation . . . ." (Doc. 29, Attach. 6 at ¶ 16.) While WSB-TV expressed interest in bringing such improper searches to light, Mr. Bullman and his law firm heard nothing from the news outlet for months. (Id. at ¶ 17.) After Mr. Bullman and his law firm began representing a second woman who had allegedly been improperly searched, they reached out to WSB-TV a second time in January or February 2022, and the news outlet expressed interest in producing a story at that time. (Id. at ¶¶ 18, 19.) On August 22, 2022, after Plaintiff filed her complaint in May, WSB-TV interviewed Plaintiff. (Id. at ¶ 21.) After the parties took Plaintiff's deposition but before discovery concluded, the story

3

aired on November 10, 2022, at 5:48 p.m. (Doc. 20 at 6; Doc. 20, Attach. 6 at 1; Doc. 20, Attach. 11 at 0:00:00.)

A news anchor opened the segment, reporting "Channel 2 Action News investigates Georgia police strip searching women looking for drugs on the side of the road." (Doc. 20, Attach. 11 at 0:00:00-0:00:06.) She stated that "two Georgia women say their private body parts were exposed to strangers" and introduced central investigative reporter Ashli Lincoln, who "look[ed] into whether these searches are legal." (Id. at 0:00:10-0:00:20.)

Ms. Lincoln reported:

I found the Supreme Court says we have a right to privacy when it comes to strip searches. That's why they're usually done in the privacy of a jail, but for both of these women, they were done right on the side of the road in front of male officers and onlookers.

(Id. at 0:00:21-0:00:35.)

The news segment showed dash camera footage depicting the search of Plaintiff. Defendant can be heard saying "lift your bra up and shake it out" before Plaintiff pulls her shirt down, exposing her breasts. (Id. at 0:00:36-0:00:40.) While Plaintiff's face is blurred, Defendant's face is not. (Id.) In the interview, Ms. Lincoln asked Plaintiff what she did the first time she saw the video; Plaintiff responded: "I cried." (Id. at 0:00:40-0:00:45.) Using only Plaintiff's first name due to privacy concerns, Plaintiff described the interaction with Defendant: "She's going up and down, and all around. And the whole time

4

whenever I'm just sitting there thinking like, I mean, this cannot be legal." (<u>Id.</u> at 0:00:55-0:01:06.)

While showing dash camera footage of the search, Ms. Lincoln reported the footage "show[ed] the moment Cindy says Brooklet Police Officer Dee Dee Estes conducted a full body cavity search on her in plain view of the public, after deputies suspected Cindy of having drugs on her during a traffic stop." (<u>Id.</u> at 0:01:06-0:01:20.) Plaintiff conveyed, "She's putting her fingers like inside me in the front and then like up the backside of me." (<u>Id.</u> at 0:01:20-0:01:26.) Ms. Lincoln reported, "Estes was called to assist Bulloch County Sheriff's Deputies for what was supposed to be a female pat down. Instead, Estes searched inside Cindy's private areas, making her expose her breasts in front of male officers and onlookers at this truck stop . . . ." (<u>Id.</u> at 0:01:26-0:01:42.) Ms. Lincoln also interviewed Larry Higgs, a purported witness, who said "[t]he lady stripped her down right in front of God and everybody." (<u>Id.</u> at 0:01:48-0:01:51.) Ms. Lincoln then reported on a second incident. (<u>Id.</u> at 0:01:54-0:02:45.)

Ms. Lincoln also interviewed Mr. Bullman as part of the news segment. Ms. Lincoln conveyed that Mr. Bullman "represents both women and says strip searches should be done in private." (<u>Id.</u> at 0:02:47-0:02:51.) Mr. Bullman stated, "Doing it in public, is, I mean, the law is clear, and it has been for a very long time that you don't do that." (<u>Id.</u> at 0:02:52-0:02:57.) Ms. Lincoln reported:

"I found the Supreme Court ruled in 1966, 'under Fourth Amendment searches involving intrusions beyond body's surface on mere chance that desired evidence might be obtained are forbidden.' " (Id. at 0:02:57-0:03:09.) Ms. Lincoln conveyed that Mr. Bullman said the searches did not have to be done on the side of the road. (Id. at 0:03:09-0:03:14.) Mr. Bullman added that the searches can be done "in a medical facility, it can be done in a jail, it can be done, just more in private, not in a parking lot." (Id. at 0:03:14-0:03:19.)

Ms. Lincoln reported that Mr. Bullman said that neither Brooklet nor the Griffin police departments investigated the officers' actions, and that Defendant was fired for an unrelated incident. (Id. at 0:03:20-0:03:29.) Ms. Lincoln stated that the officers found no drugs on the individual involved in the Griffin incident and that "Cindy had an old baggie with some meth residue on her." (Id. at 0:03:35-0:03:41.) Ms. Lincoln advised that Plaintiff had filed a lawsuit. (Id. at 0:03:43-0:03:48.) Finally, Ms. Lincoln stated that the Brooklet Police Department and Defendant declined their request for comment, but in court filings, Defendant said she acted in good faith. (Id. at 0:03:49-0:03:58.)

The news segment was also posted to WSB-TV's webpage (Doc. 20, Attach. 10), shared to the news station's Facebook page twice (Doc. 20, Attach. 12 at 1-2), and posted on the news station's YouTube Channel (Doc. 20, Attach. 16). At the time Defendant filed

6

the motion for sanctions, the November 10, 2022, Facebook post had 93 likes, 14 comments, and was shared 12 times, and the November 12, 2022, Facebook post had 115 likes, 86 comments, and was shared 14 times. (Doc. 20 at 9; Doc. 20, Attach. 12 at 1-2.) As for the YouTube video, it had garnered approximately 3,400 likes, 1,631 comments, and 258,000 views. (Doc. 20 at 20; Doc. 20, Attach. 16 at 1.) At the time of the hearing on February 7, 2023, Defendant represented that the YouTube video had been viewed 281,088 times. (Doc. 46, Attach. 1 at 9.) Several of the comments on the YouTube video touch on criminal action against Defendant, settlements in a civil action against Defendant, the propriety of qualified immunity, and physical harm to law enforcement. (Doc. 20 at 10-14; Doc. 20, Attach. 16 at 2-84.) There were also comments in support of Defendant and law enforcement. (Doc. 29 at 8-9.) Neither Plaintiff nor her counsel posted anything associated with the news segment online. (Doc. 29 at 10; Doc. 29, Attach. 6 at ¶¶ 35, 36.)

## LEGAL STANDARD

### I.   LOCAL RULE 11.2

Southern District of Georgia Local Rule 11.2 provides:

> It is the duty of every lawyer or law firm associated with the case not to release or authorize the release of information or an opinion, which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent civil litigation with which he or his firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

7

## II. INHERENT AUTHORITY

The Eleventh Circuit has recognized that " '[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.' " Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1320 (11th Cir. 2002) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991)). "This power 'must be exercised with restraint and discretion' and used 'to fashion an appropriate sanction for conduct which abuses the judicial process.' " Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1223 (11th Cir. 2017) (quoting Chambers, 501 U.S. at 44–45, 111 S. Ct. at 2132–33). "A court may exercise this power 'to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " Id. (quoting Marx v. Gen. Revenue Corp., 568 U.S. 371, 382, 133 S. Ct. 1166, 1175, 185 L. Ed. 2d 242 (2013)).

The key element to unlocking the court's inherent ability to sanction is a finding of bad faith. Purchasing Power, 851 F.3d at 1223; see also Thomas, 293 F.3d at 1320 ("[B]efore a court can impose sanctions against a lawyer under its inherent power, it must find that the lawyer's conduct 'constituted or was tantamount to bad faith.' " (emphasis added) (quotation omitted)). "[T]he inherent-powers standard is a subjective bad-faith standard."

8

Purchasing Power, 851 F.3d at 1223. Examples of conduct rising to the level of bad faith include knowingly or recklessly making a frivolous argument, arguing a meritorious claim simply to harass an opponent, delaying or disrupting the litigation, and hampering the enforcement of a court order. Thomas, 293 F.3d at 1320 (quoting Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998)).

Additionally, the Court's imposition of any sanction must comport with due process by providing the individual subject to possible sanction with proper notice and an opportunity to be heard. Thomas, 293 F.3d at 1320-21; In re Mroz, 65 F.3d 1567, 1575-76 (11th Cir. 1995). Notice can come from the party seeking sanctions, from the court, or from both, and the accused must be given an opportunity to respond to the invocation of such sanctions and to justify his actions. In re Mroz, 65 F.3d at 1575-76.

## ANALYSIS

On November 28, 2022, Defendant filed the instant motion. (Doc. 20.) Defendant asks the Court to sanction Plaintiff and Mr. Bullman for their extrajudicial conduct by dismissing the case with prejudice pursuant to Local Rule 11.2 and this Court's inherent authority. (Doc. 20 at 1, 19.) In response, Plaintiff argues Local Rule 11.2 does not apply to her, and neither Plaintiff nor Mr. Bullman acted in bad faith, which she contends is required whether imposing sanctions pursuant to Local Rule 11.2 or the Court's inherent authority. (Doc. 29 at 11-12.) In Plaintiff's

9

view, the Court cannot find Mr. Bullman violated Local Rule 11.2
when considering First Amendment principles.[1] (Id. at 9-21.)
Finally, Plaintiff contends Local Rule 11.2 is void for vagueness
as applied in this case. (Doc. 29 at 21-23; Doc. 46, Attach. 1 at
19-20.)

I.   SANCTIONING PLAINTIFF

First, Plaintiff is correct that Local Rule 11.2 by its terms
applies to lawyers and law firms associated with the case. (Doc.
29 at 11.) As a result, the Court will not impose sanctions against
Plaintiff pursuant to Local Rule 11.2. Nevertheless, the Court's
"inherent power extends to a full range of litigation abuses[]"
where other mechanisms only reach certain individuals or conduct.
Chambers, 501 U.S. at 46, 111 S. Ct. at 2134. However, considering
Mr. Bullman and his law firm, not Plaintiff, initially reached out
to WSB-TV (Doc. 29 at 13; Doc. 29, Attach. 6 at ¶¶ 16, 19), the
Court declines to impose sanctions against Plaintiff pursuant to
its inherent authority. Accordingly, to the extent Defendant seeks
to sanction Plaintiff pursuant to Local Rule 11.2 or the Court's
inherent power, Defendant's motion is **DENIED IN PART**.

---

[1] At the hearing, Plaintiff's counsel confirmed that Plaintiff
asserted no facial challenge to Local Rule 11.2. (Doc. 46, Attach.
1 at 19-20 (confirming "there [was] no facial challenge to the
rule" when asked whether Plaintiff's counsel took "the position
that Southern District of Georgia [Local Rule 11.2] is a per se
violation of [Mr. Bullman's] First Amendment rights").)

## II.  SANCTIONING MR. BULLMAN

Defendant argues Plaintiff and Mr. Bullman appeared in the WSB-TV interview while discovery was ongoing and presented one-sided allegations, asserted as fact, with the intent to sway public opinion, taint a prospective jury pool, interfere with a fair trial, or otherwise prejudice the due administration of justice. (Doc. 20 at 15-19.) Defendant maintains that Plaintiff's deposition testimony, the body camera footage, and the dash camera footage contradict the allegations in Plaintiff's complaint and the WSB-TV interview. (Doc. 20 at 4-6, 15-18; Doc. 39 at 4-6.) Specifically, Defendant submitted body camera footage and dash camera footage showing that she ordered Plaintiff to "lift [her] bra up and shake it out[]" and confirming that she "did not ask Plaintiff to pull her shirt off or to expose herself." (Doc. 20 at 2, 4; Doc. 20, Attach. 3 at 0:01:12-0:01:18.) Defendant also introduced portions of Plaintiff's deposition in which Plaintiff confirmed that Defendant did not ask Plaintiff to pull her shirt or bra down and expose herself. (Doc. 20, Attach. 6 at 2.) Defendant further argues that the body camera footage, dash camera footage, and Plaintiff's deposition testimony disprove Plaintiff's theory of how Defendant conducted a strip and body cavity search. (Doc. 20 at 3, 4-6, 16.) Beyond these contradictions, Defendant contends that Plaintiff's witnesses, including Mr. Higgs, have "been completely discredited." (Doc. 39 at 6.) After stating in

11

the news interview that he saw Plaintiff stripped down in the parking lot, Mr. Higgs later testified by deposition that "what he saw was not depicted on the video footage . . . , contrary to the news story and Plaintiff's own testimony." (Id. at 7 (citing Doc. 33, Attach. 3 at 7).) Moreover, while the news interview aired in Atlanta, Defendant argues that Plaintiff's and Mr. Bullman's extrajudicial acts still impact the course and scope of the case because the reach of the internet is worldwide. (Doc. 20 at 18–19.) Because the video will continue to be available on the internet, Defendant argues that the timing of Plaintiff's interview is irrelevant. (Doc. 39 at 11.) In Defendant's view, these discrepancies and the resulting response on social media sufficiently support a finding that there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice and of bad faith. (Doc. 20 at 18; Doc. 39 at 4, 8–9.)

While Plaintiff maintains that resolving credibility issues is not appropriate in this non-dispositive motion, she responds that the allegations in the news segment are not "baseless," despite Defendant's denials. (Doc. 29 at 1 n.1, 10–11.) With respect to the allegation in Plaintiff's complaint that Defendant had Plaintiff pull her shirt down and expose her breasts, Mr. Bullman concedes that "any unintended misstatement in the Complaint" that "Defendant ordered [Plaintiff] to pull her shirt

down[]" was "counsel's error." (Doc. 29 at 3 n.4; see also Doc. 29, Attach. 6 at ¶ 41.) As for the rest of the search, Plaintiff argues that video footage shows "Defendant's hand(s) go into [her] shorts and into the area between [her] legs," and "[w]hile she may have been confused as to the exact order of events," Plaintiff counters that she "has never wavered" on the fact that "her body was exposed[] and she was improperly touched by [Defendant]." (Doc. 29 at 4, 8, 10 (emphasis omitted).) Plaintiff and Mr. Bullman maintain they wanted to bring the conduct to light, encourage others to come forward, and prevent future unlawful searches, and they did not believe there was any likelihood that contacting the media would interfere with a fair trial or prejudice the administration of justice. (Id. at 6, 13-14.) As evidence of Plaintiff and Mr. Bullman's actual motives and to show that they did not act in "bad faith or in a manner designed to prejudice the administration of justice[,]" Plaintiff points out that Mr. Bullman consulted WSB-TV, an Atlanta station, before Plaintiff filed suit; this Court is never mentioned in the news segment; there is no call to action in the news segment; neither Plaintiff nor Mr. Bullman posted the link to the news segment on any social media or website; and the news segment was not a settlement negotiation strategy. (Id. at 10, 12-13, 14-15.) In conclusion, Plaintiff asserts that Defendant's claims that they acted in bad faith to sway public opinion, taint a jury pool, and interfere

13

with the administration of a fair trial are merely speculative. (Id. at 13.) For the following reasons, to the extent Defendant seeks to sanction Mr. Bullman pursuant to Local Rule 11.2 and the Court's inherent power, Defendant's motion is **GRANTED IN PART**.

A.   Local Rule 11.2

1.   Finding of Bad Faith

At the outset, the Court takes this opportunity to clarify that, despite Plaintiff's argument to the contrary, no bad faith finding is required to permit a sanction for violating Local Rule 11.2. (Doc. 29 at 12.) Although it is well settled that a federal court must make a finding of bad faith to sanction an attorney under its inherent powers, see Purchasing Power, 851 F.3d at 1223, this Court has never extended this requirement to sanctions imposed pursuant to Local Rule 11.2, and the Court declines to do so here. See Mai v. Nine Line Apparel, Inc., No. CV418-277, 2019 WL 5092478, at *4 (S.D. Ga. Oct. 10, 2019) (explaining that Local Rule 11.2 and the Court's inherent power are two separate methods of ensuring that parties receive a fair trial); cf. Chambers, 501 U.S. at 47, 111 S. Ct. at 2134 (explaining that mechanisms like Rule 11 permit a court to impose attorney's fees as a sanction and do not mandate a finding of bad faith); Purchasing Power, 851 F.3d at 1223 n.4 ("Neither Rule 11 nor § 1927 requires a finding of bad faith.").

14

2.  <u>Violation of Local Rule 11.2</u>

The Court is persuaded that all of the elements of Local Rule 11.2 are met and Mr. Bullman violated the rule.[2] Mr. Bullman unquestionably gave an opinion in connection with civil litigation. While Plaintiff would have the Court view the 11 seconds of Mr. Bullman's commentary in isolation and consider the applicability of his evaluation to other cases (Doc. 29 at 22; Doc. 46, Attach. 1 at 14 ("[T]hose 11 seconds are functionally all that really matters as it relates to the elements of 11.2 . . . .")), that is simply not how his opinions were presented to the public. Mr. Bullman's opinion of the law applicable to

---

[2] Plaintiff relies heavily on distinguishable cases evaluating "gag orders" and restrictions on the media. (Doc. 29 at 16 (citing <u>WXIA-TV v. State</u>, 303 Ga. 428, 811 S.E.2d 378 (2018)), 18 (citing <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S. 539, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976)).) Additionally, along with referencing what was not part of the opinion of the Supreme Court in <u>Gentile v. State Bar of Nevada</u>, 501 U.S. 1030, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991), Plaintiff briefly mentions that the Supreme Court "held that the lower standard of, 'substantial likelihood of material prejudice' was appropriate when dealing with a general rule regarding attorneys' public remarks in pending cases." (Doc. 29 at 19.) Plaintiff's objective in referencing these sources is not entirely clear. However, the Court notes that in <u>Gentile</u>, the Supreme Court recognized important, unique reasons for stronger limitations on attorneys in pending cases compared to the press, and while the Supreme Court may have approved the "substantial likelihood" standard, the Court did not establish it as the only standard. 501 U.S. at 1072-75, 111 S. Ct. at 2743-45. Further, the Court recognizes here that like the rule in <u>Gentile</u>, Local Rule 11.2 is designed to "protect the integrity and fairness of [the] [] judicial system," and it is "neutral as to points of view," applies "equally to all attorneys participating in a pending case[,]" and "merely postpones the attorneys' comments until after the trial." <u>Id.</u> at 1075-76, 111 S. Ct. at 2745.

Plaintiff's claims in this case was preceded by extensive commentary from Plaintiff about the facts of this case, and any request to consider Mr. Bullman's statements outside of the context in which they were presented is unreasonable. Beyond Mr. Bullman's own evaluation, he undoubtedly authorized the release of information about the facts of and evidence related to this case as Plaintiff participated in the interview and footage from the incident was displayed. Cf. Thomas, 293 F.3d at 1327 (rejecting counsel's argument that she could not be sanctioned for a client's statement in an affidavit and reasoning that "[a]n attorney should not be an unreflecting conduit through which the opinions or desires of a client or witness are permitted to flow unchecked[]").

Further, no doubt exists that a reasonable person would have expected the information and opinions released to be disseminated by means of public communication. Whatever his motivation, Mr. Bullman wanted to bring this case and Defendant's conduct "to light" and orchestrated this media attention. (Doc. 29 at 6.) This is not a case in which an attorney was merely contacted by a media outlet or even arranged a press conference.[3] Mr. Bullman and his law firm actively approached WSB-TV to produce a news segment on Plaintiff's claims not once, but twice. (Doc. 29, Attach. 6 at

---

[3] The Court specifically notes it is not passing judgment on the appropriateness of all press conferences but is simply highlighting the comparatively active role Mr. Bullman took in involving the media in this case.

¶¶ 16, 19.) Moreover, although the rule contains no requirement that the public communication be in this District, a reasonable person would also expect for the reach of a news segment to extend beyond a station's viewership. Today, news outlets regularly utilize social media platforms to connect to a wider audience both within and outside the traditional geographic broadcast television limits.

Even considering Plaintiff and Mr. Bullman's position about the timing of Mr. Bullman's contacts, the interview, and the airing of the news segment, the Court has no problem concluding the information was released in connection with pending civil litigation. While Plaintiff and Mr. Bullman highlight that Mr. Bullman and his law firm contacted WSB-TV before deciding to file suit, the fact remains that the interview occurred on August 22, 2022, while Plaintiff's lawsuit, filed on May 10, 2022, was pending. (Doc. 1; Doc. 29 at 6, 13.) An early communication does not indefinitely immunize a litigant from violating the rule.

The principal inquiry then is whether there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice. Considering the following reasons collectively, the Court concludes there is. Mr. Bullman was clearly aware of the fact that there is increasingly widespread media attention and public interest in policing. (See generally Doc. 29, Attach. 6 at ¶¶ 20,

17

26, 27; Doc. 46, Attach. 1 at 23.) Mr. Bullman then sought and, as evidenced by the views and comments on the news segment, achieved significant publicity concerning this case.

Compounding this issue, Plaintiff and Mr. Bullman presented the allegations in the case and opinions on the law as fact such that it seemed there was no dispute regarding Defendant's conduct and liability. Jackson v. Deen, No. CV412-139, 2013 WL 1911445, at *3 (S.D. Ga. May 8, 2013) (referencing earlier hearing where the magistrate judge found some of attorney's tweets "constituted improper comment about the merits of pending litigation" in violation of Local Rule 11.2 because they "essentially stat[ed] as fact what his client was alleging[]" (emphasis omitted)); see also, Gentile v. State Bar of Nevada, 501 U.S. 1030, 1074, 111 S. Ct. 2720, 2744-45, 115 L. Ed. 2d 888 (1991) ("Because lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative."). While the Court is concerned with Mr. Bullman's admitted carelessness in drafting the complaint and the resulting depiction in the news segment regarding Defendant "making" Plaintiff expose her breasts, cf. Martin v. Prospect Airport Servs., Inc., No. 1:21-CV-449-MLB, 2022 WL 4596637, at *3 n.1 (N.D. Ga. Aug. 19, 2022) (citing a case where a court required an internet publication to pull an article

18

with facts that were demonstrably false for fear the article would taint the jury pool), Plaintiff's and Mr. Bullman's presentation of the allegations as fact, not the parties' premature factual and credibility disputes, is the primary, problematic issue.

Then, Plaintiff's and Mr. Bullman's allegations and opinions were widely circulated first on an easily accessible and widely viewed major news outlet in the Atlanta area and later, on social media. The reality of modern media and the internet, however, means that the potential exposure of Plaintiff's and Mr. Bullman's commentary is not limited to the Atlanta market and has already spread beyond it, where it remains on the internet regardless of when a trial is scheduled. Thus, Plaintiff's arguments that there was no reasonable likelihood that dissemination would interfere with a fair trial or otherwise prejudice the due administration of justice because they did not utilize a Savannah news station and no trial is scheduled in this case are unavailing. Cf. Diamond Consortium, Inc. v. Manookian, No. 4:16CV94-ALM, 2017 WL 3301527, at *10 (E.D. Tex. Aug. 3, 2017) (determining absence of evidence that jury venire members were contacted was "irrelevant, given that potential and actual jurors may be tempted to use the Internet to search for information about the litigants—in spite of being warned by the court not to do so[]"); Gentile, 501 U.S. at 1075, 111 S. Ct. at 2745 ("Even if a fair trial can ultimately be ensured through voir dire, change of venue, or some other device, these

measures entail serious costs to the system. . . . The State has a substantial interest in preventing . . . lawyers[] from imposing such costs . . . .").

   3.   Void for Vagueness Challenge

   Plaintiff briefly argues Local Rule 11.2 is void for vagueness as applied in this case. (Doc. 29 at 21-23; Doc. 46, Attach. 1 at 20 (explaining understanding of making "void for vagueness as-applied challenges").) Although Plaintiff's arguments and hypotheticals are not models of clarity, Plaintiff appears to assert the rule does not "provide adequate notice as to when or where a party or an attorney can speak or frankly[,] about what[,]" because the meaning of "dissemination . . . by means of public communication" is unclear. (Doc. 29 at 22.) In response, Defendant asserts Plaintiff's argument fails because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (Doc. 39 at 14 (first quoting Bleccs, Inc. v. Augusta, No. CV 109-019, 2009 WL 10702282, at *4 (S.D. Ga. May 22, 2009); and then citing Joel v. City of Orlando, 232 F.3d 1353, 1360 (11th Cir. 2000)).)

   "Vagueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning and differ as to its application." Mason v. Fla. Bar, 208 F.3d 952, 958 (11th Cir. 2000) (citation

omitted); <u>see also</u> <u>Gentile</u>, 501 U.S. at 1077-78, 111 S. Ct. at 2746 ("The void-for-vagueness doctrine is concerned with a defendant's right to fair notice and adequate warning that his conduct runs afoul of the law." (Rehnquist, J., dissenting)). "The void-for-vagueness doctrine serves two central purposes: (1) to provide fair notice of prohibitions, so that individuals may steer clear of unlawful conduct; and (2) to prevent arbitrary and discriminatory enforcement of laws." <u>Mason</u>, 208 F.3d at 959 (citation omitted). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." <u>Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.</u>, 455 U.S. 489, 498, 102 S. Ct. 1186, 1193, 71 L. Ed. 2d 362 (1982). For example, on one hand, "law[s] interfer[ing] with the right of free speech . . . [demand] a more stringent vagueness test[.]" <u>Id.</u> at 499, 102 S. Ct. at 1193-94. While on the other hand, courts have expressed "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." <u>Id.</u> at 498-99, 102 S. Ct. at 1193.

"A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself." <u>Indigo Room, Inc. v. City of Fort Myers</u>, 710 F.3d 1294, 1302 (11th Cir. 2013); <u>Jacobs v. The Fla. Bar</u>, 50 F.3d 901, 905 (11th Cir. 1995) ("A facial challenge is one that seeks to invalidate a law

'even though [the law's] application in the case under
consideration may be constitutionally unobjectionable.' "
(quotation omitted)). With respect to an as-applied challenge,
"the claimant must show that in his particular circumstances the
statute either (1) does not provide persons of ordinary
intelligence a reasonable opportunity to know what is prohibited,
or (2) does not provide sufficiently explicit standards for those
who apply it." Ross v. City of Orlando, 141 F. Supp. 2d 1360, 1364
(M.D. Fla. 2001) (citation omitted).

First, the Court notes that in the authority Defendant cites
in reply, the courts were specifically addressing facial vagueness
challenges, and Plaintiff has since clarified she is making an as-
applied vagueness challenge. (Doc. 39 at 14); e.g. Bleccs, Inc.,
2009 WL 10702282, at *4 ("[The] plaintiff's facial challenge 'must
necessarily fail because his conduct was clearly within the scope
of the ordinance's prohibition[.]' " (quoting Joel, 232 F.3d at
1359-60)); Vill. of Hoffman Ests., 455 U.S. at 494-95, 102 S. Ct.
at 1191 (clarifying standard "[i]n a facial challenge to the
overbreadth and vagueness of a law[]" and explaining "[a] plaintiff
who engages in some conduct that is clearly proscribed cannot
complain of the vagueness of the law as applied to the conduct of
others[]"). Regardless, the particular phrase challenged by
Plaintiff cannot be considered unconstitutionally vague under
these local rules. A statute or regulation is not vague merely

because a term is not defined. <u>High Ol' Times, Inc. v. Busbee</u>, 673
F.2d 1225, 1229 (11th Cir. 1982) ("Where a statute does not define
a term, a court must also give words their common and ordinary
meaning . . . ."). The Court believes the phrase "means of public
communication" is clear in context and addresses forms of
communication that are commonly used to distribute information.
<u>Cf. Texans Against Censorship, Inc. v. State Bar of Texas</u>, 888 F.
Supp. 1328, 1369-70 (E.D. Tex. 1995), <u>aff'd</u>, 100 F.3d 953 (5th
Cir. 1996) (finding the phrase "advertisement in the public media"
was not unconstitutionally vague and was clear in context despite
uncertainty about whether internet communications transpired in
the public media). Consequently, the Court rejects Plaintiff's
vagueness challenge.

    B.   <u>Inherent Authority</u>

    As set out above, Plaintiff maintains that Mr. Bullman did
not act in bad faith. (Doc. 29 at 12.) Relying on <u>Martin v. Prospect
Airport Services, Inc.</u>, Plaintiff contends the circumstances
warranting the Court finding the plaintiff in <u>Mai v. Nine Line
Apparel, Inc.</u> acted in bad faith are distinguishable. (<u>Id.</u> at 14-
16.)

    In <u>Mai</u>, this Court found plaintiff Brandy Mai acted in bad
faith when she shared and commented on news articles regarding her
case on her personal social media pages and gave an interview to
a local news station regarding her case. 2019 WL 5092478, at *1.

23

After a failed mediation, Mai shared a news article regarding her case on her personal social media page and commented on her public relations background and silence up to that point. Id. In response, the defendant company filed a motion to seal seeking an order permitting it to file a motion to enjoin her statements. Id. Before the Court could rule on the motion, a local television station aired an interview with Mai about the case that was subsequently shared online by the news station and by Mai herself. Id. at *2. The Court found Mai's conduct warranted a finding of bad faith. Id. at *4. In particular, the Court noted that Mai's efforts began after a failed mediation, and she offered no explanation about her change in heart regarding her initial silence on the matter. Id. This, combined with her public relations background and media monitoring, was significant in determining that she acted to apply public pressure on the defendant and "influence the public's perception about the merits of [the] action." Id. Finally, the Court noted the timing of Mai's local interview was after Defendant had filed its motion indicating it wanted to enjoin her statements. Id.

In Martin, the case Plaintiff urges the Court to follow, the Northern District of Georgia denied defendant United Airlines, Inc.'s motion asking the court to sanction pro se Plaintiff James Martin and enjoin his extrajudicial conduct. In that case, Martin had emailed United's CEO, legal counsel, and various other

employees; posted online; called public officials; and protested
at United's ticket counter at the Atlanta airport. 2022 WL 4596637,
at *1. Citing <u>Mai</u>, United argued the court should use its inherent
power to sanction Martin for his bad faith conduct and enjoin him
from appearing at the counter, contacting the defendants'
employees, and posting online. <u>Id.</u> at *2-3. After evaluating local
rules in the Northern District which authorize the issuance of
orders governing extrajudicial statements in widely publicized
cases and case law in the Northern District restricting future
speech, the court determined Martin's conduct did not rise to the
level of prejudicial conduct warranting an order to cease
extrajudicial communication. <u>Id.</u> Even considering that Martin's
conduct might harm United's business and influence settlement
negotiations, the Court reasoned Martin's actions did not warrant
a "gag order" to prevent tainting the jury pool, particularly
considering the "limited publication of [his] comments." <u>Id.</u> at
*3. As for Martin's communication with employees, United had
identified no impact, other than mere annoyance at work, like
threats or harassment. <u>Id.</u>

In the Court's view, <u>Martin</u> is distinguishable and Mr.
Bullman's conduct, described in detail above, alternatively
supports a finding of bad faith sufficient to authorize the Court
to sanction him pursuant to its inherent authority. Unlike the pro
se plaintiff in <u>Martin</u> whose comments and actions had "limited

publication," id. at *3, the Court finds most important the fact that Mr. Bullman, an attorney bound by this Court's local rules, actively reached out to a large news outlet, not once, but twice. (Doc. 29, Attach. 6 at ¶¶ 16, 19.) Then, when interviewed, Mr. Bullman not only presented his opinion on the law applicable to this case as if liability in this case had already been decided, but he also carelessly allowed admittedly imprecise statements to be included. (Doc. 29 at 3 n.4; Doc. 29, Attach. 6 at ¶ 41.)

While Plaintiff stresses the absence of settlement negotiations in this case (Doc. 29 at 10, 14-15; Doc. 29, Attach. 6 at ¶¶ 33, 37), which were important in the Court's calculation of timing and finding that plaintiff Mai intended to influence public perception, the Court did not restrict a finding of bad faith to only those instances in which parties were inappropriately attempting to influence settlement strategies. The timing of Mai's efforts in relation to the settlement negotiations was just one consideration that factored into the Court's bad faith analysis. Nevertheless, the Court does note that Mr. Bullman's activities occurred after "the City of Brooklet denied liability," and he acknowledged that his motivation was to bring this conduct "to light." (Doc. 29 at 6; Doc. 29, Attach. 6 at ¶ 16.) This is enough to convince the Court that Mr. Bullman solicited the interview to "influence the public's perception about the merits of this action." Mai, 2019 WL 5092478, at *4.

26

C.   <u>Sanction</u>

Although requested by Defendant, the Court will not dismiss Plaintiff's case.[4] However, the Court feels that a proper and warranted sanction on Mr. Bullman is a fine of $500.00, payable to the Clerk of the United States District Court for the Southern District of Georgia, to deter others from similarly disregarding this Court's local rules and penalize Mr. Bullman's conduct.

**CONCLUSION**

Accordingly, Defendant's motion for sanctions (Doc. 20) is **GRANTED IN PART** and **DENIED IN PART**. Mr. Bullman is **DIRECTED** to pay his fine within 14 days of the date of this order.

SO ORDERED this **29**ᵗʰ day of June 2023.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[4] The Court recognizes that the parties represented that Plaintiff had proposed a stipulation of dismissal in this case. (Doc. 46, Attach. 1 at 4.) While the Court is not dismissing Plaintiff's case as a sanction, the parties are free to submit a proper stipulation of dismissal after Mr. Bullman complies with this Court's order, should they so choose.